IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANGELA M. STONESTREET, | CASE NO. 5:20-CV-01646-JG |
| Plaintiff, | JUDGE JAMES GWIN |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | REPORT AND RECOMMENDATION |
| Defendant. | |

### INTRODUCTION

Plaintiff Angela M. Stonestreet ("Ms. Stonestreet") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (ECF #1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred for preparation of a report and recommendation pursuant to Local Rule 72.2, and reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 25, 2021). Following review, and for the reasons stated below, I recommend that the Court **REVERSE** the decision of the Commissioner and **REMAND** this matter for further proceedings.

### PROCEDURAL BACKGROUND

Ms. Stonestreet filed for DIB and SSI on February 15, 2017, alleging a disability onset date of March 7, 2016. (Tr. 116, 130). Her date last insured was March 31, 2017. (*Id.*). Her claims were denied initially and upon reconsideration. (Tr. 116-43, 148-91). She then requested a hearing before an administrative law judge. (Tr. 120-21). Ms. Stonestreet (represented by counsel), and a

1

vocational expert ("VE") testified at a hearing before the ALJ on March 5, 2019. (Tr. 33-80). On April 26, 2019, the ALJ found Ms. Stonestreet not disabled in a written decision. (Tr. 12-32). The Appeals Council denied Ms. Stonestreet's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6). *See* 20 C.F.R. §§ 404.955 & 404.981. Ms. Stonestreet timely filed this action on July 27, 2020. (ECF #1).

## FACTUAL BACKGROUND

### I. ADMINISTRATIVE HEARING

Ms. Stonestreet, represented by counsel, appeared before an ALJ on March 5, 2019. (Tr. 36). Also present at the hearing was a vocational expert, Mr. Holderead. (*Id.*). Ms. Stonestreet's complaints stem from her uncontrolled Type I diabetes mellitus ("diabetes"), including diabetic neuropathy, blackouts, issues with concentration, memory, and other cognitive issues. (Tr. 38). She is unable to use an insulin pump to control her blood sugar and instead must inject insulin periodically throughout the day. (Tr. 54). Ms. Stonestreet testified that she lived alone with her dog. (Tr. 40). Ms. Stonestreet testified that her dog is not a licensed therapy dog because she was unable to afford the licensing fee, but aids her in managing the extreme effects of her diabetes mellitus such as blackouts and seizures. (*Id.*). Ms. Stonestreet testified to having a driver's license but did not regularly drive, as she had blacked out behind the wheel during a diabetic episode. (Tr. 42-43, 58).

She had worked as a waitress/food server at a local restaurant. (Tr. 43-45). Ms. Stonestreet's most recent job was working as a cashier but she was terminated because of her poor health. (Tr. 41, 46-53). Her hours varied in that position; she worked from 26-40 hours per week and her usual schedule was Friday, Saturday, and Sunday, open to close. (Tr. 41-42, 47). Although

her employer told her that she was permitted to check her blood sugar while at work, Ms. Stonestreet stated that once she was on the job, she was not permitted to take breaks, even after her doctor sent in a note on her behalf. (Tr. 48-49). Because Ms. Stonestreet was the only employee scheduled in this store, she was unable to take necessary breaks to check her blood sugar, take her medications, or eat snacks to regulate her blood sugar levels. (Tr. 49-52). This job also entailed Ms. Stonestreet stocking shelves and ringing up customers. She testified that her nerve damage, neuropathy, nerve pain, and carpal tunnel syndrome made these tasks difficult, and she often dropped products she was attempting to shelve. (Tr. 48, 53).

During the hearing, she was unable to make a fist with her left hand. (Tr. 53). Ms. Stonestreet has been seen for her carpal tunnel and a knee injury related to her neuropathy, but she is unable to have surgery due to her uncontrolled diabetes mellitus and risk for seizure or coma. (Tr. 54-55). Although she is generally able to do chores around her home, Ms. Stonestreet testified that she often had to do them one-handed due to the neuropathy in her left hand. (Tr. 58-64). She also experiences extreme swelling in her feet, ankles, and calves, and must sit with her legs elevated. (Tr. 64-66). She has nerve damage in her stomach as well, causing nausea, vomiting, and further complications in controlling her blood sugar. (Tr. 66-69).

The VE also testified at the hearing. (Tr. 71-79). The ALJ posed the following hypothetical to the VE: A hypothetical individual who is the claimant's age and education, with the same past work, limited to light work with frequent hand controls with the left, frequent handling and fingering with the left and feeling with the left, frequent ramps and stairs, no ladders, ropes, and scaffolds, frequent stoop, kneel, and crouch, occasional crawling, no unprotected heights, moving mechanical parts, or operating a motor vehicle, limited to simple, routine, and repetitive tasks but

3

not at a production rate pace, simple work-related decisions. (Tr. 72-73). In response to this hypothetical, the VE testified that the hypothetical could still work as a waitress, but could no longer work as a cashier checker due to the "constant" need for reaching, handling, and fingering. (Tr. 73). Other work for this hypothetical individual included a cashier II, cleaner, housekeeping, and sales attendant. (Tr. 73).

In providing this testimony, the VE considered limitations on the use of the left hand based on his training, education, experience, knowledge of the labor market, and consultation with his colleagues. (Tr. 73-74). According to the VE, if the hypothetical individual could only perform "occasional" hand controls, fingering, and feeling with the left hand, the sales attendant position would be eliminated, but the individual could still perform the cashier and housekeeping jobs. (Tr. 74). The individual could also work as a photocopy machine operator and as a waitress. (Tr. 74-75). But if the individual needed to be off task for 15 percent or more during the workday, or regularly absent more than one day per month, work would be precluded. (Tr. 75). And if the individual required two additional unscheduled breaks per day, such individual would not be employable. (*Id.*). Most employers would not tolerate breaks of five minutes per hour to check and maintain blood sugar levels. (Tr. 78-79). A sit-stand option would not be work-preclusive, but elevating legs to heart level once per hour would. (Tr. 76-77).

## II. PERSONAL AND VOCATIONAL EVIDENCE

Ms. Stonestreet was 40 years old on the alleged onset date of her disability; she was therefore defined as a younger individual age 18-49 (Tr. 23; *see also* 20 C.F.R. §§ 404.1563). Ms. Stonestreet had past relevant work as a waitress and as a cashier-checker; however, this work did not rise to the level of "substantial gainful activity" under the Act. (Tr. 23; *see also* 20 C.F.R.

§ 404.1565). Given her residual functional capacity, the ALJ found Ms. Stonestreet could perform past relevant work as a waitress. (Tr. 23-24).

### III.  RELEVANT MEDICAL EVIDENCE

**Dr. Salem.**[1] James K. Salem, M.D., is Ms. Stonestreet's endocrinologist and treats her for her diabetes. (*See* Tr. 503-68, 623-26, 930-44, 1315-94, 1580-1643). Dr. Salem diagnosed Ms. Stonestreet with Type I diabetes mellitus, uncontrolled. (*See, e.g.*, Tr. 503). As such, Ms. Stonestreet's blood sugar has "extensive variability" and fluctuates from values well above 400 and below 70 mG/dL. (Tr. 546; *see also* Tr. 505, 524, 532). Lab results from May 29, 2015 showed high blood sugar levels at 330 (a normal range is 70-100 mG/dL). (Tr. 533). A review of her glooko (a diabetes monitoring app) readings from 2018 indicated ranges from a low of 52 to a high of 501 mG/dL, with readings frequently above 300 mG/dL. (Tr. 1605-43). Notes indicated that Ms. Stonestreet was generally compliant with her medication. (Tr. 524, 528; *cf.* Tr. 526, 549). She usually checks her blood sugar eight times daily. (Tr. 1594). Dr. Salem's progress notes also indicated hyperlipidemia in her hands and feet, with decreased sensation. (Tr. 503, 507, 523-24, 542). Ms. Stonestreet was diagnosed with a seizure disorder, with her last episode in 2013. (Tr. 506). In March 2017, Ms. Stonestreet was diagnosed with diabetic gastropathy, which presented with frequent vomiting and slow gastric emptying. (Tr. 935, 1600).  She also has a history of diabetic neuropathy and bilateral carpal tunnel syndrome. (Tr. 523, 1587-89, 1600).

---

[1]    The Commissioner's brief reversed the specialties of Ms. Stonestreet's treating physicians, referring to Dr. Salem as Ms. Stonestreet's "primary care physician" and Dr. Drolshagen as her "endocrinologist." (Def.'s Br., Doc #15, PageID 1766-68). Dr. Salem is an endocrinologist and specializes in treating patients with diabetes; Dr. Drolshagen practices family medicine.

On February 27, 2017, Dr. Salem completed a functional capacity questionnaire indicating Ms. Stonestreet's symptoms, including fatigue, difficulty walking, blurry vision, infections/fevers, excessive thirst, rapid heartbeat, swelling, chronic skin infections, malaise, muscle weakness, hot flashes, abdominal pain, vascular disease, insulin shock/coma, nausea/vomiting, pain and numbness in the extremities, loss of manual dexterity, frequent urination, difficulty concentrating, dizziness/loss of balance, headaches, and hyper/hypoglycemic attacks. (Tr. 624). To support this list of ailments, Dr. Salem wrote his clinical findings as "diabetic polyneuropathy associated [with] diabetes, loss of feeling in limbs, unable to grasp/stand [or] walk." (*Id.*). Dr. Salem indicated that Ms. Stonestreet could not walk without rest or severe pain and could only sit or stand for twenty minutes at a time. (Tr. 624-25). He further opined that Ms. Stonestreet could sit or stand/walk less than two hours in an eight-hour workday (Tr. 625). He indicated that she would need to take a break at least every 20 minutes for an average of 20 minutes and would need to elevate her legs above her heart four to six times per day for longer than 20 minutes. (*Id.*). In Dr. Salem's opinion, Ms. Stonestreet could never crouch or climb ladders and could rarely twist, stoop, and climb stairs. (Tr. 626). He indicated that Ms. Stonestreet had significant limitations with reaching, handling, and fingering. (*Id.*). According to Dr. Salem, Ms. Stonestreet would need to be absent more than four days per month. (*Id.*).

**Dr. Drolshagen.** Colin Drolshagen, M.D., is Ms. Stonestreet's primary care physician, and he regularly treated her for issues related to her diabetic polyneuropathy. (*See, e.g.*, Tr. 975, 1009-10, 1058, 1104). In February 2016, Dr. Drolshagen prescribed tramadol to help control her pain. (*Id.*). On June 7, 2016, Dr. Drolshagen's notes indicate that Ms. Stonestreet's diabetes was better

6

controlled with a pump. (Tr. 982). However, in that same visit, Dr. Drolshagen also noted peripheral neuropathy and positive Tinel's and Phalen's signs bilaterally. (Tr. 982-83).

On June 27, 2016, Dr. Drolshagen diagnosed Ms. Stonestreet with bilateral carpal tunnel syndrome and noted that her pain was increasing and she required hand braces. (Tr. 988). She was dropping dishes and had trouble opening doors due to the carpal tunnel syndrome. (Tr. 989, 995, 1009, 1017). Ms. Stonestreet sometimes was unable to draw her insulin due to increased hand pain. (Tr. 1031). Wrist injections did not improve her pain. (Tr. 1008, 1017). Although Ms. Stonestreet saw an orthopedic surgeon for her carpal tunnel syndrome, she was determined not a good candidate for surgery due to her uncontrolled blood sugar. (Tr. 1017). In June 2016, Dr. Drolshagen indicated that Ms. Stonestreet also had bilateral paresthesia in her legs. (Tr. 1002-07). Positive Tinel's and Phalen's signs continued throughout her treatment with Dr. Drolshagen. (*See, e.g.*, Tr. 1002-07, 1018). Notes from December 2016 indicate that Ms. Stonestreet had her insulin pump removed. (Tr. 1032).

Dr. Drolshagen's treatment notes from August 24, 2017 state "[p]oorly controlled diabetic even the insulin pump did not work out for her." (Tr. 1121). In January 2017, Ms. Stonestreet fell on her right knee. (Tr. 1045). Although she was able to ambulate without crutches, her leg would give out on her at times; Dr. Drolshagen's notes indicate that she may have suffered a meniscus tear. (Tr. 1045-54). She was later on physical therapy. (Tr. 1099).

On November 23, 2018, Dr. Drolshagen sent a letter—presumably for Ms. Stonestreet's employer—stating "[i]t is my medical opinion that Angela Stonestreet needs to be able to check her sugar/glucose every hour[] as needed." (Tr. 1577).

7

**Dr. Lane.** In July 2016, Dr. Salem referred Ms. Stonestreet to Gerri B. Lane, M.D. for her diabetic gastropathy. (Tr. 574). Dr. Lane diagnosed Ms. Stonestreet with gastroparesis diabeticorum.[2] (*Id.*). Ms. Stonestreet presented with persistent nausea with vomiting and early satiety. (*Id.*). Dr. Lane's notes indicate that Ms. Stonestreet has "frequent" DKA (diabetic ketoacidosis)[3] episodes, with blood sugar often in the 500-600 range. (Tr. 577). Other treatment notes from August 2016 indicate Ms. Stonestreet underwent a gastric emptying study and her vomiting improved. (Tr. 630).

**Dr. Vogelgesang.** In September 2017, Ms. Stonestreet saw consultative examiner Mark Vogelgesang, M.D., who performed manual muscle testing during the examination. (Tr. 1139-44). Dr. Vogelgesang noted that Ms. Stonestreet had difficulty in lifting her arms above her shoulders as well as a very slow and deliberate gait. (Tr. 1139). Her left hand was unable to open, close, or pinch during the exam, and Dr. Vogelgesang found it "nonfunctional." (*Id.*). Dr. Vogelgesang stated that Ms. Stonestreet's uncontrolled diabetes was likely to cause her more problems in the future. (Tr. 1140). He opined that Ms. Stonestreet was "possibly totally disabled because of her

---

[2] Gastroparesis diabeticorum is a condition in which diabetic neuropathy affects the body's autonomic nerves controlling the bladder, intestinal tract, stomach, and other organs. In gastroparesis diabeticorum, the stomach loses the ability to move food through the digestive system, causing vomiting and bloating. This condition makes it difficult to match insulin doses to food portions. American Diabetes Association, *Autonomic Neuropathy*, https://www.diabetes.org/diabetes/complications/neuropathy/autonomic-neuropathy (last visited Sept. 30, 2021).

[3] Diabetic ketoacidosis is a life-threatening complication of diabetes, which develops when the body does not have enough insulin to convert blood sugar into energy; instead, the liver must break down fat for fuel, producing ketones. This condition can lead to diabetic coma or death. American Diabetes Association, *DKA (Ketoacidosis) & Ketones*, https://www.diabetes.org/diabetes/complications/dka-ketoacidosis-ketones (last visited Sept. 30, 2021).

uncontrolled diabetes and the poor left hand and upper extremity function and pain when touched." *Id.*

**Dr. Magleby.** On August 15, 2016, Joshua Magleby, Ph.D., conducted a consultative psychological examination on Ms. Stonestreet. (Tr. 584-90). Dr. Magleby found her to have low average intelligence, unspecified depressive disorder, generalized anxiety disorder (with panic attacks), and histrionic traits. (Tr. 588). Despite these diagnoses, Dr. Magleby found that Ms. Stonestreet was able to follow directions, could complete simple repetitive tasks, and maintain attention and concentration, but that she was somewhat impaired in her ability to relate to others. (Tr. 588-89).

**Dr. Bonner-Jackson.** On October 1, 2018, Aaron Bonner-Jackson, Ph.D., conducted a neuropsychological evaluation and follow up reports with Ms. Stonestreet. (Tr. 1646-63). CT scans returned normal results. (Tr. 1650-52). Dr. Bonner-Jackson's report indicates ranges below expected levels, suggesting inconsistent engagement with the examination and calling into question the credibility of the results; he indicated that findings from the examination could not be interpreted meaningfully. (Tr. 1648). However, Dr. Bonner-Jackson also indicated that Ms. Stonestreet "has many risk factors for cognitive impairment, including chronic anxiety, poorly controlled diabetes, and fragmented sleep." (*Id.*).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2018.

2. The claimant has not engaged in substantial gainful activity since March 7, 2016, the alleged onset date (20 CFR 434.1571 *et seq.*, and 416.971 *et seq.*).

9

3.      The claimant has the following severe impairments: diabetes mellitus, circulatory system disorder, carpal tunnel syndrome, anxiety disorder, depressive disorder, and neurocognitive disorder (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following additional limitations: The claimant can frequently handle, finger, and feel with her left hand. She can frequently climb ramps and stairs. She can never climb ladders, ropes, or scaffolds. She can frequently stoop, kneel, and crouch. She can only occasionally crawl. She can never work at unprotected heights, work around moving mechanical parts, or operate a motor vehicle. The claimant is able to perform simple, routine, and repetitive tasks – but not at a production rate pace. The claimant can make simple, work-related decisions.

6.      The claimant is capable of performing past relevant work as a waitress. DOT 311.477-030, SVP, light. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from March 7, 2016, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 18-24).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). In determining whether the Commissioner's

10

findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security,* 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up). A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted).

Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

11

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

12

DISCUSSION

Ms. Stonestreet asserts two issues:

The ALJ erred by failing to satisfy the treating physician requirements under C.F.R. § 404.1527 and failed to provide controlling weight to Plaintiff's treating physicians without good reason. The ALJ indicated Plaintiff was treated by two physicians, provided a conclusory sentence without describing what kind of doctors the ALJ was referring to, for how long they treated Plaintiff or even what the providers treated Plaintiff for.

The ALJ erred by assigning Plaintiff a Residual Functional Capacity (RFC) that is not supported by substantial evidence. The ALJ failed to consider the whole record in the file, listed Plaintiff's severe medical impairments including diabetes mellitus and only mentioned it once in his decision, and failed to provide any credence to Plaintiff's hearing testimony and how it was consistent with the medical records.

(Pl.'s Br., Doc. #13, PageID 1742). The Commissioner opposes, asserting that the ALJ reasonably assessed Ms. Stonestreet's RFC and reasonably considered Ms. Stonestreet's diabetes. (Def.'s Br., Doc. #15, PageID 1769-79). For the reasons that follow, I agree with Ms. Stonestreet.

**I.      The ALJ failed to follow the treating physician rule.**

As outlined in full above, Ms. Stonestreet alleges that the ALJ did not properly apply the treating physician rule found in 20 C.F.R. § 404.1527, particularly with respect to the opinions of Drs. Salem and Drolshagen. (Pl.'s Br., Doc. #13, PageID 1754). The Commissioner responds by arguing the ALJ properly discounted the treating physicians' opinions because they were not consistent with the other evidence in the record. (Def.'s Br., Doc. #15, PageID 1773).

The treating physician rule, found in 20 C.F.R. § 404.1527, governs opinion evidence for claims filed prior to March 27, 2017.[4] Under this rule, the Commissioner gives controlling weight to a treating source's medical opinion on the issue of the nature and severity of the claimant's

---

[4] Ms. Stonestreet's claim was filed on February 15, 2017; therefore, the treating physician rule controls. (Tr. 116, 130).

13

impairment, if it is well-supported by medically acceptable diagnostic techniques and is not inconsistent with the record. 20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give the treating source's medical opinion controlling weight, it looks to the length, frequency, nature, and extent of the treatment relationship, as well as the supportability, consistency, specialization, and other factors to determine the weight to give the opinion. *Id.* at § 404.1527(c)(2-6). There also exists a rebuttable presumption that the opinion of a treating physician is entitled to great deference, even if it is not afforded controlling weight. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). With the treating physician rule comes a "clear procedural requirement" to "always give good reasons" in the decision for the weight given to the treating source opinion. *Id.*; *see also Wilson*, 378 F.3d at 544.

This need for a well-explained decision is of particular importance when benefits are denied. Social Security Ruling ("SSR") 96-2p explains that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement serves three purposes: it helps the claimant understand the disposition of their case, it ensures the ALJ correctly applied the treating physician rule, and it permits meaningful review of the ALJ's application of the rule. *Wilson*, 378 F.3d at 544-45.

There is no question that Drs. Salem and Drolshagen are Ms. Stonestreet's treating physicians. They treated Ms. Stonestreet regularly throughout the period in question; evidence in the record indicates that Ms. Stonestreet began treatment with them at least as early as 2015.

14

Therefore, the medical opinions of Drs. Salem and Drolshagen should be afforded controlling weight, unless they are inconsistent with the record. Nevertheless, the ALJ reasoned as follows:

> Two treating sources have opined that the severity of the claimant's symptoms would prevent her from being able to stand, sit, or walk for a total of 8 hours. They also opined that the claimant is significantly limited in her ability to lift, carry, grip, grasp, and manipulate objects. These limitations would preclude all full-time work activity. Despite coming from treating sources, I cannot give these opinions controlling weight, or even great weight, because they are inconsistent with the normal diagnostic test results and the clinical observations – discussed above. In addition, they are given little weight because they are inconsistent with the claimant's activities of daily living – including work activity.

(Tr. 23).

The Commissioner asserts the ALJ provided the requisite "good reasons" to support the decision by "reasonably explain[ing] that the opinions were 'inconsistent with the normal diagnostic test results and the clinical observations – discussed above.'" (Def.'s Br., ECF #15, PageID 1774). I do not agree with this assessment of the explanation.

As a subsequent reviewer, the ALJ's terse description creates a failure to provide a logical bridge between the evidence and the result. This short paragraph—even when referring to the rest of the decision—does not sufficiently explain the ALJ's reasoning for rejecting the treating physicians' medical opinions as inconsistent with the record. Here, there are multiple instances in the record and described in the ALJ's decision *consistent* with the treating physicians' assessments of Ms. Stonestreet's abilities. For example, Ms. Stonestreet regularly complained of diabetic neuropathy in her hands and at the hearing demonstrated to the ALJ that she was unable to use her left hand (Tr. 53); Dr. Drolshagen noted the same in multiple visits (Tr. 989, 995, 1009, 1017, 1031); Dr. Salem found diabetic neuropathy, decreased sensation, and bilateral carpal tunnel

15

syndrome (Tr. 503, 507, 523-24, 542, 1587-89, 1600); consultative examiner Dr. Vogelgesang found that Ms. Stonestreet's left hand was "nonfunctional." (Tr. 1139). The ALJ's one-sentence direction to review the prior discussion does not persuade me otherwise or provide an understandable explanation to demonstrate that the treating physician rule was correctly applied and requires remand.

**II.     The ALJ's RFC assessment was not supported by substantial evidence.**

Ms. Stonestreet asserts the ALJ's determination of RFC was not supported by substantial evidence and did not properly consider Ms. Stonestreet's uncontrolled diabetes and its effect on her capacity to work. (Pl.'s Br., Doc. #13, PageID 1759). Ms. Stonestreet also contends the RFC does not properly accommodate her need to check her blood sugar every hour, as required by Dr. Drolshagen. (*Id.* at 1760-61). The Commissioner counters that the ALJ properly determined her diabetes to be a severe impairment and reasonably addressed her functional limitations in the RFC. (Def.'s Br., Doc. 15, PageID 1777-78). In the Commissioner's opinion, Ms. Stonestreet need only check her blood sugar six times per day, and only up to four times during the workday. (*Id.* at 1778). I agree with Ms. Stonestreet that the RFC is not supported by substantial evidence and does not provide adequate consideration of her need to frequently check her blood sugar levels throughout the day.

In the five-step sequential analysis, the claimant has the burden of proof in Steps One through Four, but at Step Five, the burden shifts to the Commissioner to establish whether the claimant has the RFC to perform work available in the national economy. *Walters*, 127 F.3d at 529. To meet this burden, the ALJ must make a finding, supported by substantial evidence, that the claimant has the vocational qualifications to perform specific jobs. *Howard v. Comm'r of Soc.*

*Sec.*, 276 F.3d 235, 238 (6th Cir. 2002) (internal quotations omitted). The ALJ is responsible for evaluating the medical evidence and the claimant's testimony to form an assessment of RFC. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (quoting 20 C.F.R. § 416.920(a)(4)(iv)). The RFC is to be an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been factored in. *Id.* at 632 (internal quotations omitted). An ALJ may also rely on a VE's testimony in reaching this conclusion, so long as it accounts for the claimant's limitations. *Id.* (quoting *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d. 777, 780 (6th Cir. 1987)). This, however, does not mean that a hypothetical posed to the ALJ must include a listing of all of the claimant's medical impairments. *Id.* Nor does it impose on the ALJ a requirement to include all limitations proposed in the evidence. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). An ALJ may reject limitations and "is only required to incorporate those limitations which he has deemed credible." *Id.*

At the hearing, the VE provided his opinion as to Ms. Stonestreet's need to check her blood sugar up to every hour. (Tr. 78). Ms. Stonestreet would likely need three to five minutes per hour to check her blood sugar and possibly eat a snack. (Tr. 77-78). In the VE's opinion, an individual could be off-task no more than 15 percent of the workday, and away no more than one day per month on a regular basis. (Tr. 75). A break of five minutes per hour would be under 15 percent of the workday, but in the VE's opinion, might be enough distraction from work-related tasks that an employer would not tolerate such an accommodation. (Tr. 78-79). Despite this testimony, and despite ample evidence in the record, the ALJ did not include an accommodation in the RFC for Ms. Stonestreet's need to check her blood sugar, whether more than or less than the work-preclusive 15 percent.

17

Ms. Stonestreet's physical and mental complaints all stem from her uncontrolled diabetes. And even though Ms. Stonestreet has attempted to use an insulin pump to better control her blood sugar and avoid needing as many breaks throughout the day, the pump did not improve her ability to control her blood sugar and her levels remained high. (Tr. 1121). On her doctor's recommendation, the pump was removed. (Tr. 1032). At times, Ms. Stonestreet has even suffered from diabetic ketoacidosis, a life-threatening condition. (Tr. 577). Ms. Stonestreet must therefore have the ability to regularly check her blood sugar during the workday—without this accommodation, she is at great risk of hospitalization, coma, or even death. Despite the Commissioner's contention, this is not an accommodation that can be scheduled around the workday. *See Weiland v. Berryhill*, No. 1:17CV727, 2018 WL 1750461, at *18 (N.D. Ohio Feb. 28, 2018), *report and recommendation adopted*, No. 17-CV-727, 2018 WL 1744810 (N.D. Ohio Apr. 11, 2018) ("The ALJ does not explain, however, how [the claimant] would be able to 'arrange' a problem with her blood sugar so as to avoid work hours, particularly in the context of full-time work. Nor does the ALJ address the issue of the unpredictability and frequency of [the claimant's] blood sugar episodes . . . ."). This case must therefore be remanded to form an RFC supported by substantial evidence and consistent with the record, particularly as regards Ms. Stonestreet's need to regularly check her blood sugar throughout the workday.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying DIB and SSI not supported by substantial evidence and recommend the decision be **REVERSED** and remanded for further proceedings.

Dated: October 6, 2021

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

*ANY OBJECTIONS* **to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.** *See United States v. Walters,* **638 F.2d 947 (6th Cir. 1981);** *Thomas v. Arn,* **474 U.S. 140 (1985).**